**UNITED STATES of America, Plaintiff,**

v.

**Fred CLINE and wife, Luzene Cline, Defendants.**

**Civ. No. 1954.**

United States District Court
W. D. North Carolina,
Asheville Division.

Jan. 2, 1964.

See also, D.C., 199 F.Supp. 676.

William Medford, U. S. Atty., Asheville, N. C., for plaintiff.

Frank M. Parker and James M. Baley, Jr., Asheville, N. C., for Eastern Band of Cherokee Indians.

Herbert L. Hyde and Roy W. Davis, Jr., Asheville, N. C., and E. B. Whitaker, Bryson City, N. C., for defendants.

CRAVEN, Chief Judge.

This suit started as an ejectment action, but has been narrowed, by reason of stipulations, to a boundary line dispute between the United States and the Clines—i. e., simply whether the Clines' occupancy of land is within that owned by the United States in trust for the Indians, or within a pond area deeded by the Indians to Bryson City.

By a deed dated July 1, 1924, the Eastern Band of Cherokee Indians purportedly conveyed to the town of Bryson City, North Carolina, a tract of land lying along the Oconaluftee River. Bryson City proposed to build a dam across the river for hydroelectric purposes; the land it proposed to purchase from the Cherokee Indians was the upper river area that would be covered by water impounded by the dam. The deed attempts to describe the prospective pond area as "being fully bounded and described" in a manner which may be summarized as follows: Beginning on the east bank of the Oconaluftee River at an iron stake, Survey Station 36 + 09.6, at the common line of R. M. Waldroup and the Cherokee Nation; running thence *on a level line* with the indentation of the River bank to the right and left of a traverse line that follows specified courses to designated intermediate Survey Stations, the last of which is Survey Station "94 + 72.-8; said survey station being the limit of normal back water:"

"Thence within the banks and with the channel of the River a distance of 2890′ to an iron stake on the East Bank of the River * * * 260 feet below the swinging bridge; thence directly crossing the Ocona Lufty (sic) River to an iron stake * * *; thence *down* and within the banks of the Ocona Lufty River to Goose Creek; a distance of 1350′; crossing the Goose Creek 250′ from its mouth; thence continuing down the Ocona Lufty River a distance of 1540′ to an iron stake in the edge of a branch in the common line of the Cherokee Nation and Henry Nelon, Survey Station 87 + 77.3; said Survey Station being the limit or (sic) normal back water on the West Bank of said River; Thence to the center of said River and with the thread of the stream down said River a distance of 5950′ to a point in the common line of R. M. Waldroup and the Cherokee Nation; thence with said common line to the beginning point; containing 25 acres pond area more or less."

As a preamble to the habendum of the deed, there is set out the formal resolution of the Council of the Eastern Band

of Cherokee Indians approving the sale. The resolution recites a letter from the town of Bryson City proposing to buy the lands *"as per survey of Chas. E. Waddell, Civil Engineer"*. No reference to any *map* or *plat* is contained in the deed. The letter further states that "This parcel of land lies within the reservoir area of the purposed (sic) Hydro Electrical Development of the Town of Bryson City."

The conveyance sought to be made— that of a hypothetical area that would be covered by water when the dam was constructed—defied ordinary linear measurements to circumscribe. The problem was not unlike attempting to describe the pattern that would be made by a glass of spilled milk. So resort was had to "traverse" and "contour" lines. But the traverse line recited in the description is merely a control line following the general path of the river; it bounds nothing; it encloses nothing. It is a line *from* which a contour line or "level line" can conveniently be surveyed either to the right or to the left.

The contour or "level" line is, in turn, simply a line running along the ground at a constant elevation—just as the water would run when raised to that level by the dam. The premise of a "level line" is, of course, a specified elevation. If that is known, competent engineers can plot the pattern on the ground. But the draftsman failed to include in the description the elevation at which the contour line was to run. The deed states only that the boundary shall be "on *a* level line with the indentation of the river bank". At *what* level?

This is indeed the heart of the lawsuit unless the description in the deed is so fatally defective that the answer cannot be attempted.

The Clines urge the validity of the deed, and the United States has *not* asserted its invalidity. If invalid, the result is that the United States still owns *all* the land. Judgment ejecting the Clines would follow as a matter of law, unless the 1957 agreement between the United States and Nantahala Power &

Light Company (purchaser from Bryson City) is sufficient to pass title to Nantahala—a question neither pleaded nor considered at the trial. And Nantahala is not a party to this action. If it had been, the boundary dispute might well have become moot!

It would be ironic, if not inequitable, for the United States to prevail by reason of defectiveness of its own ward's deed to Bryson City.

■ The court concludes—resolving its own doubt—that the deed is not void for indefiniteness of description. *Id certum est quad certum reddi potest.* See: N.C.G.S. § 8–39; Holloman v. Davis. 238 N.C. 386, 78 S.E.2d 143 (1953); 26 C.J.S. Deeds § 30, et seq.

What is conveyed?

Plaintiff tried this case on the theory that the dam which Bryson City planned to build was to be 44 feet in height and that this elevation was the "level line" in the deed.

Evidence of the precise height of the proposed dam, at least so far as relevant to Bryson City's purchase from the Cherokee Indians, is contained in a letter of transmittal of the deed to the United States Secretary of the Interior. That letter states that the land conveyed to Bryson City was in accordance with a proposal to purchase an area that would be covered by water impounded back of a *44-foot dam*. The same height dam is indicated on a map of the area prepared by Charles E. Waddell, numbered 1424, dated November, 1923, and labeled "Plat of Land to be Acquired from Cherokee Nation for 44′ Dam for Bryson City". Though that map bears a date antedating the deed, no reference to that specific map is made in the deed. The deed, in fact, refers to *no* map; it only refers, in the preamble, to a "survey of Chas. E. Waddell", but the court finds that said map is illustrative of said survey.

The letter to the Secretary of the Interior *postdates* the deed in question. The Secretary approved the deed on August 27, 1924. The letter also refers to the deed having conveyed the land "as

shown by the map prepared by Engineer Charles E. Waddell herewith submitted with the papers." The explanation in the letter of the boundary of the area conveyed directs that reference be made to the enclosed map, and notes that by such reference it might "be seen * * * (that) * * * the Indian land beginning at the line marked 'Cherokee Nation' extends along the east side of the river * * *." Neither of the Waddell maps (1423 and 1424) denominates the Indian property line as that of the "Cherokee Nation". *But* counsel for defendants discovered such a Waddell map [1] (Ex. X) *after* the trial of this matter, and contends that it should be recognized as the map controlling the conveyance and should now be considered by the court. The court reverses its prior ruling, and Ex. X is received in evidence.

There are now in evidence *three* Waddell maps (1423, 1424 and Ex. X), all antedating the execution of the deed and all illustrative of the survey. No. 1423 does not show the height of the proposed dam. No. 1424 shows the dam height as 44 feet. Ex. X shows "crest of the dam" 1988.73.

Also, on Ex. X, the elevation of the bridge rail *immediately below the proposed dam* is given as 1969.21 feet. The difference in elevation between the two is 19.52 feet. Mr. Davis supplied the court with the elevation of that same bridge rail *based on modern elevation computations*—1817.29 feet above sea level. On the basis of that reading of the elevation of the bridge rail, the modern elevation of the crest of the dam would be 1836.81 (a difference of .60 feet from that contended for by the United States).

Plaintiff's expert witnesses, both of whom were engineers and surveyors— Messrs. Davis and Cabe—testified that the dam is presently *35 feet* high and that by *referring to elevation markers* placed by the United States Coastal &

Geodetic Service the elevation of the crest of the dam in its present state is *1828.41* feet above sea level. Defendants' expert witness, also an engineer-surveyor—Mr. Bearden—testified that he found the present elevation of the crest of the dam to be 1828.37 feet above sea level, a difference of .04 of a foot, which Mr. Bearden stated he would concede. Simple arithmetic produces this result: add 9 feet to a 35-foot dam and it will reach a height of 44 feet; add the same 9 feet to an elevation of 1828.41 and the resultant elevation will be *1837.41*. Plaintiff asserts that the elevation of 1837.41 feet above sea level is the contour or "level" line forming the boundary of the reservoir area conveyed by the Cherokees.

By way of summary, disregarding fractional discrepancies [2], one Waddell map shows the proposed dam height to be 44 feet; another shows it to be (translation to modern figures) 1837.41 feet above sea level. If the present height of the dam is, in fact, 35 feet, these are simply two different ways of expressing the same thing.

Defendants earnestly contend that the present height of the dam is not 35 feet but is only 30 or 31 feet. This contention is based on the proposition that the height of the dam is to be measured from "mean low water level", but defendants' own expert, Mr. Bearden, testified: "I don't know who can define mean low water in the first place." On cross-examination, defendant elicited from Mr. Cabe, one of plaintiff's experts, testimony tending to show that after Nantahala added a foot to the dam in 1942 it was 31 feet above "mean low water", but Cabe had testified previously that the dam was 35 feet high, that its elevation was 1828.41 feet and that if it were raised to a height of 44 feet its elevation would be 1837.41 feet above sea level. His testimony was buttressed by plaintiff's other expert witness, Mr. Davis. The court

---

1. In the files of the United States.

2. The bridge rail now is leaning, which may account for .60 of a foot. Davis letter November 4, 1963.

shares the uncertainty of the experts as to what is meant by mean low water.

Other evidence does not support defendants' contention of a dam height of 30 or 31 feet. The deed (D–2) from Bryson City to Nantahala mentions dam heights of 40, 44 and 50 feet. That deed incorporated all the conveyances to Bryson City, including the one from the Cherokee Indians, embracing the dam and reservoir area purchased from the Indians. The 1423 Waddell map shows contour lines plotted at 130, 140 and 150-foot levels, but this map does not show the height of the dam.

The defendants urge that the appropriate contour-boundary line to be followed is *not* at an elevation of 1837.41 feet, but at an elevation of 1843.41 feet, 6 feet higher than that contended for by the plaintiff, which would embrace *all* the "Cline property". Though it is not clear from the record, it appears that the elevation of 1843.41 is supposed to be equivalent to the 150-foot contour line on the Waddell map No. 1423 introduced into evidence as Defendants' Exhibit No. 1. Defendants' counsel, in final argument, explained, at the court's request, that their contention that the controlling contour line was at an elevation of 1843.-41 was arrived at as follows: The beginning point in the description in the deed from the Eastern Band of Cherokee Indians was on the adjoining property line of one R. M. Waldroup and at survey station 36 + 09.6 thereof; that point is located on the 150-foot contour line on Waddell map No. 1423; the 150-foot contour line designated on the map is the same as the 50-foot contour line description used in the deed from R. M. Waldroup to Bryson City dated April 24, 1923, and conveying property for the reservoir area; the same 50-foot contour line ties in with a contour line at the corner of property belonging to one Henry Nelon and plotted on Waddell map No. 1423, which corner marks a corner described in the conveyance from the Cherokees to Bryson City; these lines designated variously as 50 and 150 are equivalent to recently determined elevations of 1843.41.

The fallacy of this argument is that the deed from Waldroup to Bryson City conveyed such property as might be covered by "waters impounded by a *forty or fifty foot dam * * *,* as the case may be". It is true that the crest of a *50*-foot dam and the level of water impounded by it would be at an elevation of 1843.41 feet above sea level; a dam 6 feet lower in height would stand at 44 feet and an elevation of 1837.41—which is precisely the elevation-contour line contended for by the United States!

But, aside from that, the court is just not convinced that the starting point of the Cherokee Indian conveyance at survey station 36 + 09.6 is in fact on the 150-foot contour line plotted on the Waddell map No. 1423. The contour lines drawn on that map are so close together that it is impossible to distinguish whether that point is on the 150-foot line or between it and the 140-foot line. Further, the Cherokee Indian deed calls for "(b)eginning * * * at an iron stake". Is the "level line" to be run from the top or the bottom of that stake? Further uncertainty is added to defendants' contention by their attempt to establish that the present dam is 31 rather than 35 feet high, and that (its present elevation being 1828.41) an addition (13 feet) sufficient to raise it to 44 feet in height would set the contour-boundary line at an elevation of 1841.41, two feet less than the elevation contended for by defendants and four feet more than that contended for by plaintiff. The two theories are inconsistent, and neither has sufficient probative force to leave the question unresolved.

From the evidence, and by its greater weight, the court finds:

1. The present height of the dam is 35 feet.

2. The elevation of the present crest of the dam is 1828.41 feet above sea level.

3. In 1924, at the time of the execution of the deed to Bryson City,

it was intended that the dam would be built to a height of 44 feet, and if that had been done, the crest of the dam would have been 1837.41 feet above sea level.

4. The "level line" called for in the deed was intended to be, and is, in fact, 1837.41 feet above sea level.

All of defendants' objections to evidence are overruled. Perhaps some have technical merit, but, unquestionably, the ultimate facts set out hereinabove are supported by competent evidence entirely separate and apart from that evidence sought to be excluded by defendants.

In addition to the findings of fact contained in this memorandum opinion, the court incorporates by reference certain findings of fact proposed by the plaintiff under file date of October 9, 1963. The following proposed numbered findings are found to be true:

Stipulations I, II, III, IV, V

Findings 1, 2, 3, 4, 5, 6, 7, 9, 10, 21.

All other proposed findings (8, 11 thru 20) are rejected except as they may be contained in this opinion; some are evidentiary and argumentative, and at least one is irrelevant.

No. 8 is probably true, but is denied in paragraph 5 of the Answer. But it makes little difference. Where water would go if ponded at 1837.41 is the question. The precise boundary of Cline's occupancy is unimportant except as his buildings may be affected by the ponding pattern.

The court's conclusions of law are:

1. This court has jurisdiction of this action under Title 28, Section 1345 of the United States Code, and all parties are properly before the court.

2. The United States is the owner of all the lands described in the pleadings except the land deeded by the Cherokees to Bryson City, which is an area of land which would be flooded by water impounded by a dam built to an elevation of 1837.41 feet above sea level, which is the "level line" in the deed.

3. To the extent, if at all, that the Clines occupy property which would not be flooded by water at the elevation of 1837.41 they are trespassers upon the lands of the United States and ought to be promptly evicted from said land.

Since the contour or "level" line is found to be 1837.41 feet, there remains only the considerable problem of plotting such a "level" line on the ground. It must, of course, be done as of 1924 when the deed was executed. Placing the level line on the ground as it was in 1924 is complicated by the fact that an estimated 1,000 truckloads of dirt and sawdust has been dumped on the land upon which Cline's buildings are located since the conveyance from the Cherokees to Bryson City in 1924. The United States' own witnesses agree that the level line (1837.41) strikes the walls of some of Cline's buildings at distances ranging from 16 to 24 inches from their bases; that the level line would carry a distance of from 6 to more than 10 feet under certain of the buildings. To that extent, at least, the Clines are not on the lands of the United States.

The court is simply unable to determine from the evidence the pattern formed on the ground by pondage of water at 1837.41.

Jurisdiction is retained to hear additional evidence, inspect the premises, and make that determination. Probably the court will have to appoint its own surveyor-engineer. Query: whether the English language and engineering knowledge combined are capable of describing in words the pattern made by pondage of water? See: Civil Engineering Handbook, 3rd Ed., McGraw Hill (1950), pp. 62, 67. Estimation will undoubtedly be required. Since precision is now needed, the parties ought to attempt to agree on straight line course and distance to substantially reflect the spilled milk pattern which will otherwise result.